Mr. Hoagland My name is Keith Hoagland I represent the plaintiff in the case and may it please the court. In the proceedings below, the claims court initially held that it would review Congress' unprecedented practices of increasing, diverting, and rescinding patent fees to determine whether they promoted the progress of useful arts by securing an inventor's rights. Although the claims court never reversed its initial holding or never held that another standard should apply, it did not ever explain how the legislation at issue in this case met the applicable test. There is no reasonable, direct, or substantial connection between Congress' practices, which operate to tax patent fees, and its constitutional power under the Patent Clause. In fact, these unprecedented practices are diametrically opposed to the constitutional grounds of authority. Congress cannot use its power under the Patent Clause to tax inventors. Justice Sotomayor One of the issues, at least, is whether or not we're even in the Patent Clause. Aside from the, there are cases that accept that a condition of the imposition, the conditioning patent on the imposition of fees is within the Patent Clause. Beyond that, is there anything beyond that? Because I think this presents a different question and frankly I think it's pretty novel and different as to whether or not this is in the Patent Clause and I don't know anything that has spoken to that yet. Am I correct about that? I think that there's not anything that speaks directly to the issue, but I think that the Supreme Court's decision in Graham v. John Deere is pretty clear that Congress is free to enact conditions on the grant of a patent. It can enact those conditions as long as it's consistent with its original authority. And to go back, we would not No, but I'm talking about two different things, and I'm sorry, maybe I didn't make myself clear. Conditioning a patent on the imposition, imposing fees as a condition of getting a It seems to me that the issue in this case is somewhat different. What you're challenging is not the imposition of fees as a condition of a patent. It's the ability of Congress to then extract or use those fees for some purpose and whether or not that's reviewable under the Patent Clause. And it seems to me those are two different questions. Okay, very good, Your Honor. I understand the question you're making. The question is that is there somehow, once you say, and we freely admit that Congress can enact patent fees. They can enact an application fee, they have an issue fee, they have maintenance fees, they have various different kinds of fees. And there's no constitutional problem? With them enacting fees? Absolutely not. And they've designed to have a, they give a discount to small entities. We have no dispute with that. What we do say is that if you look back on the historical, the history behind the original enactment of, the reason that that patent clause is in the Constitution is because there is a great suspicion of monopoly taxation when they wrote the Constitution of the United States. And in, the Supreme Court has said when you evaluate, you know, the language of the Constitution, you go back and look what is the historical reasons for them putting that language in there. Historically, there was a great suspicion of monopoly taxation when they wrote the Constitution. And this, there's some prior British misuse of the patent power. Well, is there anything wrong with Congress taxing patents as long as it doesn't violate the direct tax provision? Well, theoretically, it could, but what it cannot do is it cannot condition the grant of a patent on an unconstitutional fee that has broad discretion. So you agree that they could tax patents as long as they complied with the direct tax clause? What they, for example, they do, certainly they tax the income that an inventor receives. No, but what's the answer? Yes, they can do that? They can, well, no, they cannot directly tax a patent because that's one of our arguments as well is that a patent is a type of property if they try to directly tax it. And I'd say as long, the only barrier to that is the direct tax clause. No, that's not true. The specific barrier is the patent clause. They cannot use, there's a specific... So the patent clause itself, you say, bars a tax on patents. That's true. I'm not sure that I had read your argument as saying that. Are you not pressing the point of initiated in Judge Dyke's question that this would be a direct tax? Yes, it would be a direct tax. And for that reason, we also think that it's unconstitutional. That's an alternative argument that we made. I understood Judge Dyke's question to be whether Congress could use some other power to tax, for example... I didn't understand you to be giving up the direct tax argument. No, no, we're not, certainly not. I know, and I did. The authority that the defendant, for example, has asserted is that there's some, for example, you use a commerce clause, which permits you to regulate commerce. And there's no doubt that patents are something that's used in interstate commerce. Okay, but if you say, okay, can you turn to the commerce clause and let them regulate patents, you've read out of the Constitution a specific limitation on their power. There's a specific clause. They took the time in the Constitution to put a specific clause governing patents. But even if you're right about that, you do accept, do you not, that there's some rational basis test that's applied to the exercise? Actually, what we asked for is that the court apply exactly the same test that the Supreme Court applied in Eldred. And what the Supreme Court did in Eldred is they said there's a two-part test. First, you look and see if the legislation is fundamentally inconsistent with the clause. And we say that it is, in fact, fundamentally consistent with the clause. What legislation are we talking about here? Are you talking about the diversion? You're not talking about the appropriations of money. Are you not talking about the extraction of the fee? So what legislation are you talking about? For example, in 1999, the President proposed at the same time that patent fees be increased so that they could rescind $71 million. The President proposed $116 million. Congress accepted that the patent fees would be increased enough so that they could rescind $71 million. I have the citations for both the 1991 patent fee increase legislation as well as the silent fees. So the answer to my question is the legislation you're speaking of is the legislation that opposed the fees? Yes. You wouldn't have standing to challenge the diversion legislation, right? Our standing is that we have standing to challenge a fee that has been imposed on us. The fee imposition, yes, but not the diversion. You only can challenge the legislation imposing the fees. We can challenge the legislation, yes, that's true. But you're not challenging all of the legislation. You're challenging legislation imposing the fees to the extent that those fees were not ultimately used by the Patent Office, right? That's partly true, but there is, for example, that 19— Well, what part of it is not true? The part that is that in 1999, there was a specific fee legislation that increased patent fees in order to offset a rescission. So what we're challenging is that we don't challenge the fee legislation to the extent it's actually used to fund the Patent Office, but we certainly do challenge it to the extent it's used for other purposes. Well, then I'm not sure that I understand your argument. If, in fact, there were no shortfall in the operation of the office, you then wouldn't be challenging at all what you might call an excess fee, or at least the maintenance fee. We know that in some countries the maintenance fees are a very large source of national income and totally independent of the cost of running the office. So that your argument depends, then, on the need of the office for these funds to run itself, and otherwise you'd be raising no challenge? Congress's power to enact fees is limited to the extent that they're needed to fund the operations of the Patent Office. The congressional record is perfectly clear. The legislative record is that we're diverting these patent fees. We're increasing, extending, and diverting and rescinding these patent fees so we can offset other spending. Well, wait a minute. But there's something between giving the money to the Patent Office and offsetting other spending. I mean, are you suggesting, I mean, the test is it not, the test you're advocating is whether it promotes the arts and sciences, right? If the test doesn't say you've got to give it back to the Patent Office to use to promote the arts and sciences, correct? No, that's not, in fact, we don't agree, no, in fact, there's some, in fact, there's some ancient history about that in the United States. The Patent Office had, in one time, used patent fees to fund agricultural research in the 1800s. No, but let's assume that the legislation said this. It said we're imposing $100 million of fees, we're going to give $60 million to the Patent Office, we're going to put $40 million to the Treasury, generally, because we think that $40 million is used to support that part of the court system that provides support to patent litigation. Suppose they'd said that. Would that be unconstitutional? That would, that would be, we think, if that were, those are not the facts in this case. Yeah, but you get hypotheticals in oral arguments. Very good. If those were the facts, we would still challenge that to the extent the patent clause says that the Congress has the power to secure an inventor's rights. And there's some other... So what was, I'm not seeing, what's wrong with that? $60 million for the operation of the Patent Office, $40 million to support patent litigation. What's the matter with it? The, possibly that, possibly we, I don't, the problem that I have with that is that the courts are funded by general taxpayer revenue, which includes... But assume there's no shortfall, or assume that there is a shortfall in the office, and still the $40 million is diverted to some other purpose. Does your argument turn on whether or not the office needs the fees, could use the fees, in order to reduce its backlog? Both are, both are the case. It's definitely the case that the Patent Office needed those fees to fund its operations. And it's also the case that Congress never said, we're going to increase these fees so we have enough money to fund the judiciary. But what's the, what's the answer to my hypothetical? Is it unconstitutional or is it okay? Okay, the first answer is that we would oppose it on the grounds that it, that the Patent Clause says that it gives them the power to secure an inventor's rights. Once the patent is granted, they have in effect secured inventor's rights. But there's also due process issues about having a right to access to the courts. There would be some other issues that are raised in that, but it is, but that's our central question. I'd like to reserve the balance. What was the answer to the question? I mean, what was the answer to Judge Teich's question? The answer is that my, that our position is that the, the principal position is that the, is that Congress should, cannot impose a tax on inventors to support the operation of the courts. But that's not... Even that part of the court, even that part of the courts is devoted to patent litigation. Even that part of the courts is devoted to patent litigation. And why is that? Because the Patent Clause gives them the power to secure an inventor's rights. An inventor's rights. There, there's a whole other body, there's a whole other question that you'd have to open up there in order to say that they have provided some provision for an indigent inventor, for example, who cannot afford the cost of, of a, of a judge's time to hear a patent dispute. There'd have to be a whole other host of issues that was addressed in that, in that context. Okay, let's hear from the other side. We've, we're exhausting Mr. Ryan's time. May it please the court. Mr. Muzoguchi. May it please the court. We respectfully submit that the judgments below should be affirmed because Congress's fee and appropriations legislation is not limited by the preamble to the Patent's Clause. Is, is the government's position that it could, that Congress could appropriate the entire income, the entire maintenance fee income, let's say, and allow the in the patent office if, in fact, that were what Congress decided to do? Yes, Your Honor. It's our position that Congress's legislation is not limited by the preamble's promotion language on which the appellant relies. And alternatively, Your Honor, it's our position that even if we assume that the preambular language applies to Congress's fee and appropriations legislation, that there is, in the record, support indicating a rational basis for Congress's legislation. Let, let me, let me ask you about, so you differ from the Court of, I mean, the Court of Claims, as I understood it, said we're going to look at it under the Patent Clause, and we're going to discern whether or not there's a rational basis under the Patent Clause. That's correct, Your Honor. So your position is no Patent Clause, we're just evaluating it, Congress's action under the General Welfare Clause. Or necessarily improper, but not necessarily constrained by the promotion language of the preamble. Because the Patent Clause text itself, it applies to the subject of whether, and, and exclusive rights can be granted for limited times to inventors or discoverers. It does not concern the fiscal subject. The history of the framers' drafting of the Patent Clause text, as was revealed in the appellant's reply brief, or confirmed, shows that, so the premiums and provisions to promote. The framers omitted that language in the final text of the Patent Clause, and under the Penn Railroad precedent that the omission of language in the draft. How does that help you? I saw that in the brief. I don't understand how that Well, Your Honor, our intention is the preambular language that is in the Patent Clause does not apply to the fiscal subject of whether Congress will have enacted a PTO, whether Congress will enact fees at a certain time. But you're not saying, you have to then conclude that this also goes so far as to authorize a direct tax on inventors. Well, I'm not. Doesn't it? To follow through, saying that if Congress wants to tax inventors because they're there, and they're rich, and the stakes are high, and they, you might get away with it, or whatever reason. I think, if Your Honor's asking me whether Congress may enact a fee, that's not fully appropriate. I'm sorry. I'm looking at the direct tax aspect. What is the justification for a tax on inventors, saying that not only we provide this framework where you can get a patent if you're an inventor. However, we're also going to load fees on it throughout the life of the patent, and we will use those fees for general governmental purposes. And I think your answer to my first question was that that's all right. And my response, then, is to raise the question of the direct tax, and how you harmonize that principle. Well, to start with the direct tax, we do not, we disagree that this would qualify as a direct tax because the fees in question are not a tax on persons or real property, which direct taxes have been construed to be. But rather, it's a fee condition on the patent privilege. There is no property right to be tasked prior to satisfaction of the condition that the fee be paid. So we submit that it is not a tax. Yes, but that's all right, because we have the property. And let's, if it simplifies things, recognize that until maintenance fees were adopted, the there weren't any to divert. So this, as you know, the income bulge started to arise with the imposition of the maintenance fees. Thereafter, as the nation took this technological leap that we're experiencing, at the moment there has been an increase all around, a very large increase in the demands on the patent office. And according to the briefs, I was surprised at the five year pendencies in some of our most active areas of technology. So we know that there are larger national interests here as well. And there's a point, I would imagine, or at least I've always believed, where constitutional issues and the national interests are considered together. So to try and put all this together is really quite significant because the record shows, but for this past year, where I don't know, perhaps all of this agitation has gotten the attention of Congress, we know that the backlog in the office has been apparently accepted by many people as a serious drain on our innovation momentum. So all of these things together, trying to focus on the issues, keeps bringing me back to the direct tax and the illegal exaction argument based on the direct tax principle. And I'd be interested in your comment. I'll try to address Your Honor's question. To the extent the question is, well, can fees be enacted by Congress in excess of the amount that is being constitutional requirement that Congress appropriate an amount equal to fees, there's no minimum pendency requirement. And one of the things that Supreme Court and Bonito both explained in discussing patent legislation was that there's a balance that needs to be struck between promoting through innovation via exclusion, and the promotion that can occur through annotation and refinement without the exclusive right. Perhaps, but it's nonetheless, it's based on the Constitution, at least the promotion of innovation, the promotion of the useful arts. So there is a stage, is there not, in which we have a larger picture to consider of the national interest and its constitutional foundation? And it takes me back to your initial answer to my question, where you said there's no limit on what Congress can do in this area. That's correct, Your Honor. But we also submit that what Congress is doing does serve the rational, does, can be shown to have a rational basis consistent with promotion. Because as I was just discussing in Bonito votes, there's this fee that is not tied to cost. Your Honor mentioned maintenance fees. Well, maintenance fees, Your Honor, are an example in which the fee itself is not. This is to discourage people from filing for bad patents or maintaining bad patents, is what you're talking about? Or excessive filings, excessive patent claims. There's nothing in legislative history anywhere that demonstrates that that was the purpose of any of the legislation going back and forth, is it? Well, in part, no, but in part, yes, Your Honor. In terms of setting patent fees to relate to the number of claims or excessive claims, there is a discussion of that in our brief. In the broader sense of the balancing test that I've articulated in the, I was about to say the rationing, the Congress, we have scarce resources. Congress could decide to set fees at a level. Well, let me ask you about where we draw the line. I mean, assuming we're not on the alternative argument that the Court of Claims based its decision on, that we're looking at rational basis under the patent clause. Okay, we've got funds for the PTO for their processing. Beyond that, we've got questions of pension and health stuff that you cite. Beyond that, we've got what Judge Dyke cited, which was to support the courts in processing patent issues. Beyond that, I mean, presumably the government's position is it's far broader. There's a rational basis. For instance, homeland security. I mean, the patent office is located in Virginia, so you could say even if you divert half the funds and they go to homeland security, that's okay because it promotes the national economy to have a safe homeland. Where do we draw the line on rational basis? Anything for homeland security enough because we're protecting the economy and it's necessary to have a thriving economy in order to promote the arts and sciences? It's hard to articulate a bright line, Your Honor, and perhaps that's why in the exercise of Article I powers, Congress is in court with a great deal of deference in revealing its judgments about what is necessary and proper to carry out the enumerated powers. I can't say to you today that this would be beyond that But you're not arguing today, are you, that this fee can be justified on homeland security and protecting the national economy in terms of rational basis? I would, Your Honor. Because part of the money was diverted to homeland security, was it not? Initially, yes, Your Honor, that's correct. Of course, the funds themselves, that's a different issue, are in a treasury account credited to the PTO, and should Congress in the future decide to inappropriate that Congress is free to do so. Did you go that far in your brief? I'm sorry? Did you go that far in your brief to say that anything that protects the national economy has a rational relationship to the patent clause? I don't believe so. So what is your view? So to the extent that in any current year funds are diverted to homeland security or to the tuition tax credit, the tuition that D.C. families get for sending their kids to college, you're saying we don't look at those purposes because we've got a general fund and sometime in the future money is fungible and that money is going to be there for the PTO? Is that your answer to the diversion? In essence, Your Honor, that's correct. Because although within a given year authorizers may make a decision that they're not going to fully, that Congress should not fully appropriate fees within that fiscal year, that doesn't mean that Congress can't in the future appropriate an amount equal to the fees that came in in that year. And as we saw earlier in discussing maintenance fees, it is not the case that the fees themselves necessarily indicate that there's a particular amount of activity or work that has to be done in the same year. So how is one ever going to, I mean we're in the patent clause now and we've got review on a rational basis, how is a court supposed to ever evaluate that if the government is telling us, well, you can't look at what we do any one year, 40 years from now we might end up giving this money back to the PTO? Well, in addition to the balancing and rationing rationale that I described on the fee side, there is a record on the effect of all of this fee legislation and the difference in the appropriation. That record, for example, and it's in the court's decision below, is to compare the amount appropriated to the PTO, the program cost, against the amount of fees that have been appropriated and then compare that with the amount of applications. So from the time of OBRA 1990 to 2004, fiscal 2004, the number of applications increased by a factor of approximately 2.1. During the same period, the amount of program costs allotted to the PTO increased by a factor of 3.6. Now much of the appellant's appeal and complaint below is based on a theory that all of what happened was a crisis in patent tendency. But that is belied by the facts, the undisputable facts in terms of the amount of spending, the real increase in that spending relative to the increase in patent applications. But why is that relevant? I mean, why is, do we have to determine that there's a crisis in patent applications before, you know, in terms of evaluating the constitutionality? Well, it's relevant to the appellant's argument that there's... I thought you said it wasn't relevant in your brief. I'm sorry? I thought you said it wasn't relevant whether there was a crisis in the PTO or not. Not relevant. I think we disagreed that there was a patency problem. You think it is relevant? You think it helps their argument that there's a supposed crisis? I don't think I would say it helps. My understanding of their argument, Your Honor, is that they're saying that the reason there's an issue with the preambular promotion test, assuming that applies, is this crisis in patent pendency. And that's undisputed, that the patent pendency is increasing in all fields. Well, we disagree with that, respectfully, Your Honor. I'm just looking at the records that we have. This isn't a matter of opinion, is it? It's a matter of fact. If their facts are wrong, we should know. I have an answer to that on two levels. First, comparing the pendency prior to the over 90 surcharges in the practice, and afterwards, you have a range prior to over 90 of 31 months to 18 months. There was always a problem of pendency that was supposed to have been resolved with the large infusion of funds based on the maintenance fees. And it wasn't long thereafter that the maintenance fees, which was a fairly large infusion of funds after the certain number of years passed, were in the patent system, which one had hoped was going to be ameliorated at a time when technology was becoming so critical to our national well-being, instead has encountered the temptations of diverting the large increase of funds, and meanwhile, with an even larger increase of pendency. These are the fundamental issues that I think the nation needs to face, and an easy way of facing it. Initially, I think a lot of people thought, was there's all this money coming in now that we finally, the only nation in the world that didn't have maintenance fees, now we too have them, and we'll have all this money, and now we don't. And so, in the larger picture of our technological strength, I think the nation has to consider that. But the question before us is, is this something that the judiciary, with the resources on which we draw, can resolve? Well, I would have thought your answer would be, it doesn't matter. I don't understand why you're standing here and arguing with the appellants as to whether or not the patent office needs more money. It seems to me pretty clear that it does. What difference does it make? Well, our position is, your honor, that there is no constitutional minimum requirement or maximum requirement on pendency, and in that sense, that's correct, your honor. We do not feel pendency matters. What I was trying to demonstrate is that the core of the appellant's complaint was that the diversion, in essence, is the cause of pendency increases, and the pendency increases prove that there can't be promotion. And if there's no, if this is not promoting and the preamble applies, it was their position that that must be unconstitutional. And our position is that there is no particular constitutional obligation to appropriate a certain amount of money in any given period of time. And the other thing I wanted to demonstrate on the record is that you think that spending levels are the cause of an increase in pendency because spending has outstripped the rate of applications. I'm mystified as to why you want to stand up there and argue that. This shouldn't be, your position should be, that's not our business to determine whether there's a crisis in the patent office or whether they need more money. But you're doing exactly what, you seem to agree with that. But we ought to be sitting here and deciding that question. Well, you can have the, if you want to respond to Judge Dyke and then we must move on. Or perhaps it, perhaps he's responded to himself. I think that's a fair comment. Is there one last word you wish to leave with us so we can, I know there's a lot in the briefs. No, Your Honor, unless there are further questions. Okay. Thank you. Mr. Ryan, you have, you have the last word. Thank you for the privilege of the dinosaur coming back after 20 years and addressing the school again. I appreciate it. I am wondering here whether I'm listening to Lewis Carroll and Allison Wunderland. What did the constitutional forefathers provide a patent clause for? Nothing. I can't believe my ears when the government argues there's no limit on the Congress. And I can't also believe the court below not having the courage to do what an article three court does when Congress reaches that upper limit. We have a constitutional provision. Congress should promote the progress of the useful arts and it tells them how, by securing to inventors the exclusive rights for limited time to their discoveries. In other words, give them patents. The Constitution does not say Congress shall have the power to impede the progress of the useful arts, helping to put a patent office in crisis, which Allison Wunderland believes there doesn't exist. By making it difficult to secure patents. In my mail the other day, I have from my small law firm two status letters from the patent office. One, a client who sadly now will receive a ship because he couldn't get a patent and raise money. He filed in 2003. And I asked the patent office, when will he get his first office action? They came back in the letter and they said, in 39 months we'll get to it. 2008. Another one filed in 2004. Response from the patent office, 29 months. This has destroyed the patent system. And when we see these acts of Congress, I don't care what you want to call them, which are supposedly passed, pursuant to Article 1, Section 8.  These bills, I'll call your attention, for example, to the appendix A200748, where Congress gives a reason in 1999 for the increase that it's putting in, for the rescission. And it says, the basis for this authority is Article 1, Clause 8, Section 8 of the Constitution. Not the Commerce Clause. Not some fictitious rainy day fund, but the other Allison Wunderland things that the government says. So, what's our result? You heard the government say, there's no limit. If there's no limit, what can future Congresses do? If the courts let them get away with this arrogant usurpation of unconstitutional power, there'll be no patent system. Read up Article 1, Section 8, Clause 8. This is the proper court. This is the proper forum. Because this is the patent court. And because you are the custodians of Article 1, Section 8, Clause 8. Congress has made a mockery of this. Of course it can pass all kinds of laws. But what does it do with the money, when it tells the world, I'm doing this under Article 1, Claim 8, Section 8, and then steals it for something else, and lets the patent office go down the drain. Inhibits the progress of the useful arts. Prevents the securing of timely patents. And I assure you, the court below didn't understand it. But the patents that are not timely granted, patent rights not timely granted, are patent rights destroyed. And my little patent office isn't the only one. And this record of bonds with it, everybody testifies to it. Well, is the patent office the most efficient thing in the world? Who knows. But certainly, Congress's action here, not in passing the law, but what does it do with the money? It lied to the American people to say this is under Article 1, Section 8. It lied to the American people that we're setting these values in these statutes to allow the patent office to meet its budget, and then it steals it for something else. Oh yes, so we'll have it in the future. But we deal with what it does right now. May I ask your liberty, please, to quote a little poem, which is indeed the impression I got from reading the government's piece. And it comes from Lewis Carroll. And it comes from Alice in Wonderland. Oh oysters, said the carpenter, we've had a pleasant run. Shall we be trotting home again? But answer came there none. And this was scarcely odd because they'd eaten everyone. The government, your honors, has outdone Lewis Carroll. It's now, inventors, says the Congress, we've had a pleasant run. Shall we divert your patent fees again? Fictitious, rainy day to fund? And this is scarcely odd because they've rescinded everyone. Thank you. Mr. Ryans, we're running short of time, so please. I didn't want to cut you off in mid-sentence. Thank you. Case is taken under submission. We'll be in recess for 15 minutes.